UNITED STATES BANKRUPTCY COURT
DISTRICT OF SOUTH DAKOTA

| | |
|---|---|
| In re: | Bankr. No. 02-40922 |
| | Chapter 7 |
| THE CREDIT STORE, INC. | |
| Tax I.D. No. 87-0296990 | |
| Debtor. | |
| | |
| JOHN S. LOVALD, TRUSTEE | Adv. No. 04-4052 |
| Plaintiff, | |
| -vs- | |
| | |
| J.L.B. OF NEVADA, INC. | DECISION RE: PLAINTIFF'S |
| a Nevada Corporation | MOTION FOR SUMMARY JUDGMENT |
| and | |
| J.L.B. EQUITIES, INC. | |
| a Delaware Corporation | |
| Defendants. | |

The matter before the Court is the Motion for Summary Judgment filed by Plaintiff-Trustee John S. Lovald and the response thereto filed by Defendants J.L.B. OF Nevada, Inc., and J.L.B. Equities, Inc. This is a core proceeding under 28 U.S.C. § 157(b)(2). This Decision and accompanying Order shall constitute the Court's findings and conclusions under Fed.R.Bankr.P. 7052. As set forth below, the Motion will be granted in part and denied in part.

I.

The present record, when considered in a light most favorable to Defendants, shows that a document entitled "CONSULTING AGREEMENT" ("Consulting Agreement") was entered into on March 1, 2002, between J.L.B. Equities, Inc., and The Credit Store, Inc. The Consulting Agreement stated J.L.B. Equities, Inc., would provide Jay L. Botchman as a consultant to The Credit Store, Inc., for a term of one year commencing March 1, 2002, and ending

February 28, 2003. The nature of the consulting services to be provided were not set forth. Under the Consulting Agreement, Botchman was to provide not more than 50 hours of consulting services per month. Compensation was to be $25,000 per month. This was to be paid in advance on a quarterly basis. Under the Consulting Agreement, The Credit Store, Inc., also agreed to pay Botchman's "direct out-of-pocket expenses" that were "actually and reasonably incurred in connection" with his consulting services. The Consulting Agreement provided these expenses would be paid upon invoices submitted by J.L.B. Equities, Inc. On May 24, 2002, The Credit Store, Inc., made a wire transfer of $61,000 to J.L.B. Equities, Inc., which transfer was the genesis of this adversary proceeding.

On August 15, 2002, The Credit Store, Inc., ("Debtor") filed a Chapter 11 petition in bankruptcy. Accordingly, Debtor's May 24, 2002, wire transfer to J.L.B. Equities, Inc., was within one year before Debtor's bankruptcy petition. On February 4, 2003, Debtor converted its Chapter 11 case to a Chapter 7 case. John S. Lovald was appointed the Chapter 7 case trustee.

On August 12, 2004, Trustee Lovald commenced an adversary proceeding against J.L.B. Equities, Inc., and an affiliated corporation J.L.B. of Nevada, Inc. (collectively hereinafter

"J.L.B.")[1]. He alleged Debtor's May 24, 2002, wire transfer to J.L.B. was avoidable as a constructively fraudulent transfer under 11 U.S.C. §§ 548(a)(1)(B) and 550(a)(1) because Debtor did not receive anything in return from J.L.B. of a reasonably equivalent value. Trustee Lovald further alleged the $61,000 payment was an avoidable preferential transfer under 11 U.S.C. §§ 547(b), 550, and 551.

On March 14, 2005, Trustee Lovald moved for summary judgment, arguing no material facts were in dispute and he was entitled to a judgment as a matter of law under §§ 548(a)(1)(B) and 550(a)(1). In contesting Trustee Lovald's summary judgment motion, J.L.B. argued evidence needed to be presented on two issues: whether Debtor was insolvent on the date of the transfer; and whether the $61,000 transferred from Debtor to J.L.B. was in consideration of consulting services of reasonably equivalent value.

II.

The applicable law regarding summary judgment and the avoidance of a constructively fraudulent transfer under 11 U.S.C. § 548(a)(1)(B) were set forth in Part II of this Court's decision

---

[1] Defendants J.L.B. Equities, Inc., and J.L.B. Equities of Nevada, Inc., have not contested Plaintiff-Trustee's characterization of J.L.B. of Nevada, Inc., as an "alter-ego" of J.L.B. Equities, Inc., that shares assets and liabilities with J.L.B. Equities, Inc. It is not clear, however, what role J.L.B. of Nevada, Inc., played in the Consulting Agreement or in the subject May 24, 2002, wire transfer.

-4-

in *Lovald v. Thornton Capital Advisors, Inc., and Recovery Partners II, L.L.C. (In re The Credit Store, Inc.)*, Bankr. No. 02-40922, Adv. No. 03-4017, slip op. at 25-28 (Bankr. D.S.D. June 23, 2004). Part II of that decision is adopted and deemed fully incorporated herein.

### III.

*Debtor's insolvency.* Trustee Lovald contends Debtor's dire financial straits in 2002 are well documented. He asks the Court to consider Debtor's 10-Q form filed with the SEC on March 31, 2002; a balance sheet for Credit Store Financial, Inc., dated June 30, 2002, from which, he contends, Debtor is shown to have had assets of $42,899,574 and liabilities of $46,881,461 for a negative equity of almost $4 million; Debtor's September 16, 2002, schedules in its Chapter 11 case, which show Debtor's liabilities exceeded its assets by $16,323,157.82; and an 8-K statement dated July 9, 2002, that Debtor filed with the SEC, in which Debtor stated it would seek Chapter 11 protection if its financial problems were not resolved within the month.

J.L.B. offered little in opposition to the Trustee's argument and record. J.L.B. argued only that the 10-Q showed a positive net worth and that the Trustee's efforts to separate Debtor's numbers from Credit Store Financial, Inc.'s numbers on that form merely created an issue of fact.

-5-

Trustee Lovald has met his burden, as required by *Handeen* v. *Lamaire (In re Handeen)*, 12 F.3d 1339, 1346 (8th Cir. 1992), of showing the record does not contain a genuine issue of material fact regarding Debtor's dire financial circumstances on May 24, 2002. As discussed in *Lovald v. Thornton Capital Advisors, Inc.*, Adv. No. 03-4017, slip op. at 25-28, Debtor's March 31, 2002, Form 10-Q, bears out Trustee Lovald's assertion under both §§ 548(a)(1)(B)(ii)(I) and (II), and Debtor's July 10, 2002, 8-K statement also bears out Trustee Lovald's assertions under § 548(a)(1)(B)(ii)(III).

> The 10-Q that the Credit Store gave the SEC, while it may have shown a positive net worth in numbers, painted a very bleak financial picture. Therein, the Credit Store acknowledged it was fully leveraged, that it did not have a positive cash flow and might not be able to achieve one, and that it had a "substantial ongoing need for capital to finance [its] operations." Therein, the Credit Store even warned of imminent default. The Credit Store's July 10, 2002, 8-K statement bears out Trustee Lovald's assertions under § 548(a)(1)(B)(ii)(III) since therein the Credit Store acknowledged that absent refinancing it would not be able to meet its current obligations.

*Lovald v. Thornton Capital Advisors, Inc.*, Adv. No. 03-4017, slip op. at 26-27. Moreover, the two reports "bookend" the transfer in question. Debtor gave J.L.B. $61,000 on May 24, 2002, less than two months after Debtor's March 30, 2002, Form 10-Q and just over two months before Debtor's July 10, 2002, 8-K statement. Nothing in the record indicates Debtor's financial circumstances changed

for the better in the interim.

As did the defendants in *Lovald v. Thornton Capital Advisors*, Adv. No. 03-4017, slip op at 27, J.L.B. likewise has failed to "advance specific facts to create a genuine issue of material fact for trial" regarding this issue. *See F.D.I.C. v. Bell*, 106 F.3d 258, 263 (8th Cir. 1997). J.L.B. briefly discussed only the 10-Q and said the need to separate Debtor's asset and liability numbers from Credit Store Financial, Inc.'s numbers created a question of fact. However, J.L.B. did not present any evidence that Trustee Lovald's separation of these numbers was incorrect. Accordingly, no material facts are in dispute under § 548(a)(1)(B)(ii).

*Debtor's receipt of "reasonably equivalent value."* One issue remains: whether any material facts are in dispute regarding what, if anything, Debtor received in exchange for the $61,000 wire transfer to J.L.B. *See F.D.I.C. v. Bell*, 106 F.3d 258, 263 (8th Cir. 1997). The parties' initial pleadings on this issue were quite general. The summary judgment documents also added little. Trustee Lovald argued in his Complaint that Debtor did not receive anything of a reasonably equivalent value in exchange for the $61,000 and J.L.B. said Debtor did. In his summary judgment brief, Trustee Lovald stated J.L.B. was relying on the Consulting Agreement, "a series of airfare charges, telephone bills and a diary" to support its argument that it gave value for the $61,000.

-7-

He argued this documentation was insufficient to establish that consulting services were actually rendered by J.L.B. for Debtor or that the value of these services equated $61,000, especially where the documented expenses described-above totaled only $20,419.19, and where many of the expenses were not shown to relate to any consulting services, including $14,000 for an air ambulance charge. Trustee Lovald also challenged the Court not to recognize the alleged services rendered before the March 1, 2002, date on the Consulting Agreement or those services rendered after the $61,000 was transferred on May 24, 2002. He conceded that, at most, J.L.B. incurred consulting related expenses of $1,079.46.

In response, J.L.B. submitted several affidavits. Patricia E. French, secretary for J.L.B. Equities, Inc., stated in her affidavit that she was Botchman's personal assistant until Botchman's death on July 31, 2004. She said Botchman was the president and sole shareholder of J.L.B. Equities, Inc. Attached to her affidavit was a copy of the Consulting Agreement that was signed by Botchman for J.L.B. Equities, Inc.; the signature on Debtor's behalf is undecipherable. She said Debtor agreed to pay J.L.B. $61,000, representing three monthly payments of $25,000 each less a set off for $14,000 to reimburse a personal expense that Debtor previously had advanced to Botchman. French said Botchman devoted almost all of his activities to Debtor's affairs between

-8-

January 1, 2002, until August 11, 2002. She said he met regularly in person and by telephone with officers, directors, and attorneys for debtor. French said Botchman reviewed daily reports that were faxed to him from Debtor's offices. French said their telephone records for outgoing calls reflected over nine hours by Botchman to Debtor's officers, directors, and attorneys. She said Debtor's telephone records would reflect outgoing calls from Debtor's offices, but Trustee Lovald had failed to timely produce them.

Michael Philippe, Debtor's former Chief Financial Officer, affied that Botchman rendered the consulting services, that the effective date of the Consulting Agreement was March 1, 2002, and that he consulted with Botchman regularly "seeking his advice and guidance with respect to matters effecting [sic] [Debtor], its financial condition, transactions with lending institutions, and other facets of the company's operation." He estimated Botchman averaged several hours of consulting services each week for Debtor between March 1, 2002, and August 11, 2002, when Debtor filed its Chapter 11 petition. In his affidavit, Kevin T. Riordan, a former president and chief executive officer for Debtor, stated almost the exact same things as did Philippe, except he added he had also consulted with Botchman at Botchman's home and office. Riordan said these visits consumed in total another 10 to 15 hours.

Former members of Debtor's board of directors, Geoffrey A.

-9-

Thompson and Barry Breeman, said they and other board members consulted with Botchman on matters regarding Debtor and its financial condition and plans. They said the consultations were both in person and by telephone. Thompson and Breeman estimated their contacts with Botchman under the Consulting Agreement exceeded 20 hours.

William O'Brien stated in his affidavit that his firm represented Debtor in some litigation, and he and his partners consulted on "many occasions" with Botchman. He estimated that between January 1, 2002, and July 8, 2002, the time of these consultations "was well in excess of 25 hours."

Trustee Lovald contended all the affidavits should be discounted by the Court because they were "filled with conclusory opinions as to the ultimate issue - whether JLB provided reasonably equivalent value - rather than actual factual allegations supporting such a conclusion[.]" He cited *In re Harris*, 209 B.R. 990, 997(B.A.P. 10th Cir. 1997), for his contention.

The Court is satisfied J.L.B.'s affidavits create a genuine issue of material fact as to whether consulting services of a reasonably equivalent value were rendered by Botchman in exchange for the $61,000. As required by Rule 56(e) of the Federal Rules of Civil Procedure, made applicable to this adversary proceeding by Fed.R.Bankr.P. 7056, the affidavits each appeared to be made on

personal knowledge, and they set forth some facts indicating Botchman provided consulting services to Debtor under the terms of the Consulting Agreement. *See O'Bryan v. KTIV Television*, 64 F.3d 1188, 1194 (8th Cir. 1995)(citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)(on a summary judgment motion, the nonmovant's evidence ordinarily is to be believed and all justifiable inferences are to be drawn in the nonmovant's favor)). Accordingly, Trustee Lovald's motion for summary judgment will be denied to the extent evidence needs to be presented under § 548(a)(1)(B)(i).

Certainly, J.L.B.'s affiants could have been more specific about the nature of the Botchman's consulting services for Debtor, when and how his services were used, and when and how Debtor paid for those services.[2] The several affidavits presented by J.L.B. also did little to directly tie Botchman's described contacts with Debtor to the fulfillment of J.L.B.'s obligations under the Consulting Agreement. While we unfortunately will not have the

---

[2] Under the terms of the Consulting Agreement, Debtor should have made a $75,000 advance payment to J.L.B. for the first quarter of services (March through May 2002); the May 24, 2002, payment logically would have been for the second quarter advance (June through August 2002). Also, the Consulting Agreement required J.L.B. to submit invoices for reimbursement of expenses. J.L.B.'s and Debtor's respective accounting records should reflect the billing and payment of those quarterly advance and expense invoices if services were rendered by Botchman under the Consulting Agreement.

benefit of Botchman's testimony, his relationships to Debtor or Debtor's principals and affiliates and his qualifications to provide consulting services for Debtor will need to be established at trial. This information is needed, first, to distinguish his services under the Consulting Agreement from other contacts and relationships he had with Debtor and, second, to assess the value of any services he rendered under the terms of the Consulting Agreement. All these specifics will need to be developed at trial for the Court to make an appropriate determination under § 548(a)(1)(B)(i) regarding whether J.L.B. gave Debtor something reasonably equivalent in value for the $61,000.

An appropriate order will be entered.

Dated this 4th day of August, 2005.

BY THE COURT,

Irvin N. Hoyt
Bankruptcy Judge

I hereby certify that a copy of this document was electronically transmitted, mailed, hand delivered or faxed this date to the parties on the attached service list.

AUG 0 4 2005

Charles L. Nail, Jr., Clerk
U.S. Bankruptcy Court, District of South Dakota
By_____ *Pm*

NOTICE OF ENTRY
Under F.R.Bankr.P. 9022(a)
Entered

AUG 0 4 2005

Charles L. Nail, Jr., Clerk
U.S. Bankruptcy Court
District of South Dakota

Corporation Trust Company of Nevada
JLB Nevada Agent for Service
6100 Neil Road, Ste 500
Reno, NV 89511

Asher Fensterheim
555 White Plains Road, Suite 230
Tarrytown, NY 10591

Peter W. Ito
Baker & Hostetler
303 E 17th Ave Ste 1100
Denver, Co 80203

John S. Lovald
Trustee
PO Box 66
Pierre, SD 57501

The Corporation Trust Company
JLB Equities Inc Agent Service Process
Corporation Trust Center
1209 Orange St.
Wilmington, DE 19801